IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| COLE JAMES KNOWLES, | CV 20-41-BLG-TJC |
| Plaintiff, | |
| vs. | **ORDER** |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Cole James Knowles ("Knowles") filed a complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner"), denying his claims for disability insurance benefits under Title II, and supplemental security income under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-83f.  (Doc. 1.)  The Commissioner subsequently filed the Administrative Record ("A.R.").  (Doc. 7.)

Presently before the Court is Knowles' motion for summary judgment, seeking reversal of the Commissioner's denial of disability benefits and remand for award of benefits or, alternatively, for further administrative proceedings.  (Doc. 11.)  The motion is fully briefed and ripe for the Court's review.  (Docs. 11-13.)

1

For the reasons set forth herein, and after careful consideration of the record and applicable law, the Court finds that the Commissioner's decision should be affirmed and Knowles' motion for summary judgment be denied.

## I.    Procedural Background

Knowles completed his application for disability benefits on July 11, 2017, alleging depression, bipolar disorder, anxiety, and compulsive obsessive disorders, with a disability onset date of July 21, 2016.  (A.R. 98, 271-83.)  The Social Security Administration ("SSA") denied Knowles' claim on October 13, 2017.  (A.R. 164-169.)  Knowles requested reconsideration on December 21, 2017, which was denied March 28, 2018.  (A.R. 170-71, 178-80.)  Knowles subsequently requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 31, 2019.  (A.R. 58-97, 181-82.)  In a post-hearing brief, Knowles' requested an amended onset date of September 11, 2016.  (A.R. 37; *see* 436-7.)  ALJ Michele Kelley accepted the amendment and rendered her opinion on December 11, 2019, finding Knowles not disabled.  (A.R. 34-51.)  On February 7, 2020, Knowles requested review of the ALJ's decision before the Appeals Council, but the request was denied.  (A.R. 1-6, 268-70.)  Knowles thereafter filed the instant action.  (Doc. 1.)

/ / /

/ / /

2

## II.    Legal Standards

### A.    Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Court must affirm the Commissioner's decision unless it "is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999).  *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may reverse the ALJ's decision to deny benefits only if it is based upon legal error or is not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)).  "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten*, 44 F.3d at 1457.  In considering the record as a whole, the Court must weigh both the evidence that supports and detracts from the ALJ's conclusions. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)).  The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational

3

interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary."). However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a conclusion. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

**B.    Determination of Disability**

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) he suffers from a medically determinable physical or mental impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work he previously performed, or any other substantial gainful employment which exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A). A claimant must meet both requirements to be classified as disabled. *Id*.

The Commissioner makes the assessment of disability through a five-step sequential evaluation process. If an applicant is found to be "disabled" or "not

disabled" at any step, there is no need to proceed further. *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 974 (9th Cir. 2000)).  The five steps are:

1. Is claimant presently working in a substantially gainful activity?  If so, then the claimant is not disabled within the meaning of the Social Security Act.  If not, proceed to step two.  *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

2. Is the claimant's impairment severe?  If so, proceed to step three.  If not, then the claimant is not disabled.  *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1?  If so, then the claimant is disabled.  If not, proceed to step four.  *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is not disabled.  If not, proceed to step five.  *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work?  If so, then the claimant is not disabled.  If not, then the claimant is disabled.  *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

## III.   Factual Background

### A.     The Hearing

A hearing was held before ALJ Kelley in Billings, Montana on October 31, 2019.  (A.R. 58-97.)  Knowles testified about his recent work experience, his daily activities, and his current work-related limitations.

Knowles was previously in the Montana National Guard and was deployed to Romania in 2016.  (A.R. 66.)  After completing his tour of duty in the National Guard, Knowles was self-employed for a period taking photographs of vehicles slated for repossession, which generally required his involvement one to two days per month.  (A.R. 67-68.)

Knowles was also employed on a part time basis for UPS as a package handler.  (A.R. 69.)  But he testified this position proved to be very difficult and frustrating for him.  (*Id.*)  Knowles felt the job was hectic and caused "red flags and alarms all over the place," which ultimately distracted him from his work.  (A.R. 75.)  His supervisor would have to escort him to a task and get him started to keep him focused.  (*Id.*)  Otherwise, noises like footsteps or the sound of boxes being thrown to the ground would take him off-task.  (*Id.*)  He was ultimately laid off from this position.  (A.R. 74.)

Knowles acknowledged that he is capable of playing video games.  (A.R. 72.)  He plays three to four hours a day, sometimes in one session and sometimes broken up over the whole day, depending on how his back feels that day.  (*Id.*)  Either way, Knowles said his tolerance for sitting is about four hours.  (A.R. 72-3.)  He avoids playing certain types of games that aggravate his anxiety.  (A.R. 73.)  Knowles explained the difference between being in a work setting and playing games is that "it's all on me."  (*Id.*)  Games are on his schedule, his rules, and his

terms.  (*Id.*)  In contrast, when he tried to work performing data entry, for example, "random variables" got into his head that he couldn't control.  (*Id.*)

Knowles also testified about his propensity for ruminating or over-analyzing his interactions with others, or tasks which need to be accomplished.  (A.R. 75.) He related how he gets distracted rehearsing the best way to do something and loses track of time, often spending hours walking in circles.  (*Id.*)  As an example, he pointed to his hearing before the ALJ as an anxiety-causing event which caused him to be unable to sleep the night before.  (*Id.*)  Another example is when he enters a building and automatically assesses the layout, such that he knows or estimates where all the exits are located for escape routes.  (*Id.*)  At home, he has trouble completing tasks, but he makes an extra effort to be presentable in public so as not to attract attention to himself.  (A.R. 76.)  But at times his depression "gets the better of [him]," and his hygiene deteriorates.  (*Id.*)

Knowles was asked about his history of conflicts with others.  Knowles explained that his time in a group home involved conflicts with other residents, which resulted in him lashing out verbally.  (A.R. 77.)  He felt this was the result of being in a confined area, and lashing out was a way he could get the place to be quiet so his PTSD was not constantly being triggered.  (A.R. 77.)

Knowles also testified regarding his physical impairments, specifically his lumbar and cervical spine.  (*Id.*)  Knowles thought that he could lift 50 pounds

once in a week, such that if he helped his dad unload water softener he could not do any more lifting that week. (*Id.*)  Daily, he thought he could lift 20 pounds at least a couple times a day. (A.R. 79.)  Knowles explained his back pain is in the mid-lower to lower back. (*Id.*)  Walking doesn't bother him if he has the right shoes, but if he picks up his pace, his back will bother him within 500 yards. (*Id.*)  Knowles thought he could stand for perhaps 30 minutes without moving. (*Id.*)  If he can adjust himself, he can stand for an hour to an hour and a half, before his pain increases. (*Id.*)  Once the pain starts, he can generally push through it for another hour or so. (A.R. 80.)  Knowles thought his biggest limiting factor is the inability to maintain a posture leaning slightly forward, as when leaning over a sink to wash dishes. (*Id.*)  For this reason, he does not wash dishes or fold clothes, and he can only vacuum if he has a cane or a crutch to lean on. (*Id.*)

Regarding his daily routine, Knowles testified he does not have anything that resembles a consistent sleep schedule. (*Id.*)  Instead, he goes for a couple of weeks where he is awake during the day, sleeping from 4:00 a.m. to 8:00 a.m., and then a couple of weeks where he generally is awake all night, sleeping from 8:00 a.m. to 2:00 p.m. (A.R. 80-1.)  After he wakes, he will have breakfast and then check for email and messages. (A.R. 81.)  Next, he will do paperwork, if necessary, and then do his chores if his back is not too painful. (*Id.*, 83.)  After chores, he plays video games for a couple of hours, breaks for lunch/dinner, and

then returns to finish his gaming.  (A.R. 81.)  The rest of the day is spent reading or watching documentaries because he likes to learn and keep his brain busy.  (*Id.*) Knowles said he tries to maintain this schedule, and it only varies when he has doctor's appointments, or when he is overcome with a bout of depression.  (A.R. 82.)  When he is depressed, he generally stays in bed for perhaps three days at a time; this has happened four or five times in the last year.  (*Id.*)

The ALJ then turned attention to Anne Taylor Arrington, vocational expert ("VE").  The ALJ posed hypotheticals to the VE, who concluded that a hypothetical individual with similar characteristics as Knowles could not perform any of his past work.  (A.R. 91.)  The VE thought, however, that such an individual could perform unskilled light-duty work as a routing clerk, such as an assembler of plastic products, or food sorter.  (A.R. 92.)  But with added limitations of being off-task 20 percent of an 8-hour workday and 40-hour workweek, the hypothetical individual could not do any of the jobs previously mentioned.  (*Id.*)

On cross-examination, the VE was asked to add certain variables to the hypotheticals, such as no public contact, no coworker contact, and seldom supervisor contact.  (A.R. 93.)  The VE responded that those limitations constitute a highly selective accommodated work setting that fall under a vocational placement and would not have representative occupations.  (A.R. 94.)  The next variable was integrating verbal confrontations or incidents of walking off the job to

avoid verbal confrontations.  (*Id.*)  The VE responded that an employer would provide for perhaps one or two such incidents.  (*Id.*)  Last, she was asked whether distracting background noise that leads the hypothetical individual off-task would change job opportunities.  (*Id.*)  The VE responded that noise cancelling devices and quiet work environments could account for some issues, but there is no way to completely control noise.  (A.R. 94-5.)

### B.  Medical Evidence

Knowles' medical evidence is extensive; the record includes a multitude of providers.  For purposes of the instant matter, the Court will briefly review the medical records of the provider the ALJ relied upon to deny benefits.

*Robert Velin, Ph.D.*

Dr. Velin performed a neuropsychological evaluation of Knowles in May and June 2017.  (A.R 641.)  Dr. Velin noted Knowles' diagnoses of Major Depressive Disorder and PTSD.  (*Id.*)  Dr. Velin observed Knowles as a pleasant and cooperative person who put forth good effort.  (A.R. 642.)  Dr. Velin's clinical findings showed Knowles to be very well developed from an intellectual perspective, with superior verbal intelligence and high-average nonverbal functioning.  (*Id.*)  His composite IQ was 113.  (*Id.*)  His assessment of central processing revealed immediate attentional abilities and concentration as broadly normal, though at the lower end of the average range.  (*Id.*)  Speed of information

10

processing was borderline, which was seen as a significant interpersonal weakness relative to intelligence, and thus Knowles would likely not do well in fast-paced or busy environments. (*Id.*) His learning and memory were also mildly impaired. (A.R. 642-3.) Knowles' higher level executive abilities were wholly intact, but complex sequencing was mildly to moderately decreased, with difficulty shifting between alternating tasks. (A.R. 643.) Dr. Velin noted Knowles' black and white approach to the world required a highly structured and routine environment, which could require accommodations. (*Id.*)

Dr. Velin summarized Knowles' evaluation as revealing mild, high functioning autism. (*Id.*) Dr. Velin recommended continued psychiatric intervention and psychotherapy. (*Id.*) If he returned to school, Dr. Velin thought Knowles would have to work with student disability services for accommodations. (*Id.*)

C.    **ALJ Findings**

The ALJ followed the five-step sequential evaluation process in considering Knowles' claim. (*See* A.R. 40-51.) At step one, the ALJ found that Knowles had not engaged in gainful activity since his amended alleged onset date of September 11, 2016. (A.R. 40.) At step two, the ALJ found that Knowles had the following severe impairments: degenerative disk disease of the lumbar spine, traumatic brain injury, depressive disorder, anxiety disorder, post-traumatic stress disorder, and

11

autism spectrum disorder.  (*Id.*)  At step three, the ALJ found that Knowles' did

not have an impairment or combination of impairments that met or medically

equaled the severity of one of the listed impairments in the Appendix.  (A.R. 41.)

Before considering step four, the ALJ determined Knowles has the residual

functional capacity ("RFC") to perform light work.  (A.R. 42.)  The ALJ found

Knowles had the RFC to:

> lift, carry, push, or pull 10 pounds frequently and 20 pounds
> occasionally; stand and walk about 6 hours of an 8-hour workday; sit
> about 6 hours of an 8-hour workday. He needs to be able to change
> position among sitting, standing, or walking during normal work breaks
> every 2 hours. He can frequently climb ramps and stairs; frequently
> balance, kneel, and crouch; occasionally climb ladders, ropes,
> scaffolds, stoop, and crawl. He must avoid concentrated exposure to
> extreme cold, vibrations, and work hazards. He can understand,
> remember, and carry out simple tasks; maintain attention,
> concentration, persistence, and pace for such tasks for 8-hour workdays
> and 40-hour workweeks; tolerate occasional interaction with
> supervisors, coworkers, and the public. He should not work directly
> with the public as part of work duties. He can tolerate usual, simple
> work situations and occasional changes in routine work settings. He
> should not work at a fast or fixed production rate or pace, but he can do
> goal-oriented work. All limitations are considered sustained work
> activities in an ordinary work setting on a regular and continuing basis,
> unless otherwise specified.

(*Id.*) (alterations added)

At step four, the ALJ found Knowles was unable to perform any past

relevant work.  (A.R. 49.)  Finally, at step five, the ALJ found that based on

Knowles' age, education, work experience, and residual functional capacity, there

were jobs that existed in significant numbers in the national economy that he could

perform: routing clerk, assembler of plastic products, food sorter.  (A.R. 49-50.)

Accordingly, the ALJ found Knowles not disabled on December 11, 2019.  (A.R.

51.)

## IV.   Discussion

Knowles presents three issues for review: (1) whether the ALJ failed to

consider Listing 12.15 relative to his PTSD; (2) whether substantial evidence in the

record supported the ALJ's discounting of Knowles' subjective symptom

testimony; and (3) whether all of Knowles' limitations were properly incorporated

into the VE's hypothetical.  (Doc. 11 at 5.)  The Court will address each in turn.

### A.   Listing 12.15

Knowles argues the ALJ erred by failing to consider whether he met Listing

12.15 (Trauma- and stressor-related disorders) after finding that his PTSD was a

severe impairment.  (Doc. 11 at 10.)  The Commissioner responds that the criteria

for Listing 12.15 is the same as for Listings 12.04 and 12.06, which the ALJ

considered.  Thus, the same result would have been reached and any error was

harmless.  (Doc. 12 at 6.)  The Court agrees.

Listing 12.15 of Appendix 1 relates to trauma- and stressor-related disorders,

including PTSD.  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(B)(11).  To meet

Listing 12.15, a claimant must satisfy the requirements of paragraphs A (medical

criteria) and B (functional criteria), or paragraphs A and C (serious and persistent criteria). *Id.* at § 12:00(A)(2).

Paragraph B represents the areas of mental functioning a person uses in a work setting. To meet the criteria therein, a claimant's mental disorder must result in an "extreme" limitation of one or "marked" limitation of two of the following four areas: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* at ¶ 12.00(A)(2)(b).

Paragraph C evaluates "serious and persistent mental disorders." *Id.* at 12(A)(2)(c). To meet the criteria of paragraph C, the mental disorder must be "serious and persistent," shown by a medically documented history of the disorder over a period of at least 2 years, and evidence that satisfies the criteria in subparagraphs C1 and C2 (as described in § 12.00(G)). *Id.* at § 12.00(A)(2)(c). C1 criteria require a finding of reliance on an ongoing basis upon medical treatment, mental health therapy, psychosocial support, or a highly structured setting to diminish symptoms. *Id.* at ¶ 12.00(G)(2)(c). C2 criteria require a finding of "marginal adjustment," or the ability to adapt to the requirements of daily life is fragile; "that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your life." *Id.*

14

The paragraph B and C criteria are the same for Listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma- and stressor-related disorders).  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(A)(2), (E)-(G).  The ALJ found Knowles did not satisfy the B or C criteria for Listing 12.04 or 12.06.  (A.R. 41-42.)  It follows, then, that Knowles would not be able to meet the B or C criteria for Listing 12.15 either.  As such, the ALJ's failure to consider Listing 12.15 is harmless error.  *See Morris v. Astrue*, 2012 WL 2912725, at *6 (D. Ariz. July 16, 2012) ("Even if the ALJ should have applied listing 12.04 instead of listing 12.08, the ALJ would have reached the same conclusion based on his findings.  Thus, even if the choice of listing could constitute an error, it would not 'negate the validity of the ALJ's ultimate conclusion' and would therefore be harmless error.").

Knowles relies on *Frost v. Barnhart*, 314 F.3d 359 (9th Cir. 2002), for the proposition that the ALJ's failure to consider a listing is reversible error.  Knowles misconstrues the Ninth Circuit's holding in that case, however.  In *Frost*, the lower court found that the ALJ's failure to consider a listing was harmless, since the ALJ's determination of the requirements of another identical listing necessarily precluded the establishment of the omitted listing.  *Frost*, 314 F.3d at 363.  The Ninth Circuit stated the lower court's "reasoning is correct, so far as it goes."  But under the specific facts and circumstances presented, the court found that part C of

both listings provided "an alternative means of demonstrating disability …" *Id.*[1]
Thus, the Ninth Circuit found it was possible that disability could have been found
under the omitted listing. *Id.* Here, in contrast, the current paragraph C criteria do
not provide such an alternative path for establishing disability.

In short, *Frost* does not stand for the proposition that an omitted listing alone
is reversible. Indeed, the Ninth Circuit has held that the ALJ need not "state why a
claimant failed to satisfy every different section of the listing of impairments."
*Gonzalez v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir.1990) (finding ALJ did not err
in failing to state what evidence supported conclusion that claimant's impairments
did not meet or exceed Listings); *Wimmer v. Astrue*, 2011 WL 761556, at *4 (W.D.
Wash. Feb. 25, 2011) (finding this is particularly true where, as here, the "claimant
has failed to set forth any reasons as to why the Listing criteria have been met or
equaled.").

Further, to the extent Knowles argues the ALJ erred in assessing the
paragraph B and C criteria, the Court finds the ALJ's findings are supported by the
record. The ALJ found Knowles had only mild limitations in understanding,

---

[1] *Frost* involved the 1997 version of sections 12.03 (obsessive-compulsive
disorder) and 12.04 (schizophrenic, paranoid, and other psychotic disorders). Part
C of both listings provided an alternative means of establishing disability where
there was a "[m]edically documented history of one or more episodes of acute
symptoms, signs, and functional limitations which at the time met the requirements
of A and B of this listing, although the symptoms or signs are currently attenuated
by medication or psychosocial support . . . ."

remembering or applying information.  (A.R. 41.)  The ALJ's finding is consistent

with the neuropsychological evaluation conducted by Dr. Velin.  While Dr. Velin

found Knowles had weakness in acquisition, processing speed, and social

challenges due to autism spectrum disorder, his testing otherwise demonstrated

strong scoring and a full-scale IQ score well above average.  (A.R. 641-644.)

　　　With regard to Knowles' ability to interact with others, concentrate, persist

or maintain pace, and adapt or manage himself, the ALJ found moderate

limitations.  (A.R. 41.)  The ALJ determined that despite Knowles' social

difficulties, he was able to engage in the community, drive, do some work, interact

with treatment providers, and maintained capacity for some interaction even in

socially stressful or challenging situations.  (*Id.*)  The ALJ also noted that although

Knowles needed inpatient treatment, he stabilized quickly with treatment, and was

able to advocate for himself and made decisions about his mental health care.

(A.R. 42.)  The ALJ further found that although Knowles reported poor attention

and ability to follow through, clinical assessments and the neuropsychological

evaluation did not show attention or concentration problems.  (A.R. 41.)  The

ALJ's observations are consistent with the record.  (*See e.g.* A.R. 376-378, 641-

644, 528, 553, 566, 569, 571, 610, 613, 633, 772, 775, 780, 821, 861, 941-42, 944,

947, 952, 959, 962, 969, 1149-50, 1158, 1162, 1166, 1168, 1170, 1178, 1182,

1188, 1190, 1210, 1222, 1223-1224, 1230, 1237, 1265, 1280, 1287, 1292.)

Knowles also appears to argue that the Veterans Administration 100% disability rating supports a finding that he has marked limitations in each of the paragraph B areas.  (Doc. 11 at 14.)  But disability determinations made by other governmental and non-governmental entities are not binding on the Commissioner. 20 C.F.R. §§ 404.1504; 416.904.  Because other governmental and non-governmental entities make disability decisions for their own programs using their own rules, their decisions are considered "inherently neither valuable nor persuasive to the issue of whether [a claimant] is disabled or blind under the Act." 20 C.F.R. §§ 404.1520b(c)(1); 416.920b(c)(1).

The evidence in the record also supports the conclusion that Knowles has more than minimal capacity to adapt the requirements of daily life and to changes in his environment.  For example, the record shows Knowles lives as an independent adult with his family (A.R. 374, 969, 1293), was able to move from Missoula to Billings and transfer his benefits and treatment (A.R. 695, 698, 861, 863, 865, 950, 1147), and has the ability to ride a motorcycle, play video games, work occasionally, go camping, and travel out of state (A.R. 72, 545-546, 553, 725, 821, 824, 966, 969, 1149-1150, 1154, 1158, 1162, 1166, 1168, 1170, 1172, 1184, 1223, 1230, 1232, 1237.)  Therefore, the ALJ's conclusion that Knowles' did not meet the paragraph C2 criteria is supported by substantial evidence.

In sum, the Court finds that although the ALJ omitted explicit reference to Listing 12.15, any error was harmless. The ALJ specifically addressed Listings 12.04 and 12.06, which have identical requirements, and found Knowles did not meet the criteria. Additionally, the ALJ's determination is supported by the record.

### B.   Knowles' Subjective Symptom Testimony

Knowles argues that the ALJ did not identify specific and legitimate reasons for discounting his subjective symptom testimony. (Doc. 11 at 25-30.) The Commissioner responds that the ALJ reasonably evaluated Knowles' subjective complaints. (Doc. 12 at 12-20.)

A claimant's testimony is analyzed in two steps. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* Second, if there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if she provides "specific, clear and convincing reasons" for doing so. *Id.* "In order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'" *Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010). "General findings are insufficient; rather, the

ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Reddick v. Chater*, 157 F.3d at 722 (quoting *Lester*, 81 F.3d at 834)).  *See also Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015).  The clear and convincing standard "is not an easy requirement to meet: '[It] is the most demanding required in Social Security cases.'"  *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014).

To assess a claimant's subjective symptom testimony, the ALJ may consider (1) ordinary credibility techniques, (2) unexplained or inadequately explained failure to seek or follow treatment or to follow a prescribed course of treatment, and (3) the claimant's daily activities.  *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996); *Fair v. Bowen*, 885 F.2d 597, 603-04 (9th Cir. 1989).  An ALJ may also take the lack of objective medical evidence into consideration.  *Baston v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004).

Here, the ALJ determined that Knowles' medically determinable impairments could reasonably be expected to cause his symptoms, and there is no argument that he is malingering.  Therefore, the ALJ was required to cite specific, clear, and convincing reasons for discounting his subjective testimony about the severity of his symptoms.  The Court finds the ALJ did so.

Knowles alleges that his ability to work is impaired by his difficulties interacting with coworkers and supervisors, coping with changes in routine,

comprehension and memory problems, managing workplace stress due to hypervigilance, hyper-self-consciousness and feeling threatened by coworkers. (A.R. 374-381; 425-428.)  The ALJ determined Knowles had some limitations in his ability to perform work activity, and therefore, reduced his RFC accordingly to accommodate those limitations.  (A.R. 45-47.)  Thus, the ALJ did not entirely reject Knowles' subjective symptom testimony.  Rather, it appears the ALJ parsed out those allegations she found credible from those that she found not credible, as she was required to do.

Regarding Knowles' back problems, the ALJ found the medical records did not substantiate his subjective allegations of total disability.  (A.R. 44.)  The ALJ pointed out that Knowles' degenerative disk problems were mostly mild, he had been treated conservatively, and his activities of daily living demonstrated the ability to perform light work.  (*Id.*)  The ALJ's findings are supported by the evidence in the record.  For example, imaging studies generally demonstrated mild findings.  (*See* A.R. 614 (X-Ray showing "Possible mild chronic T11 compression" and "Minimal stable retrolistheseis L4 upon L5."); 615-18 (MRI showing "Mild wedge compression deformity of T11 and mild height loss at T10", "Lumbar vertebral body height and alignment are within normal limits," and noting some "mild" to "moderate" disc bulge and foraminal narrowing).) Likewise, physical examinations showed no significant back problems, normal

gait, and normal or good range of motion.  (A.R. 320, 525, 576, 625, 663, 670, 674, 873-874, 962, 965-966, 1087, 1112.)  The medical records also indicate Knowles was prescribed physical therapy, which helped improve his back symptoms.  (A.R. 468-508, 518, 662, 659, 710, 727, 733, 735, 751, 965.)  The record further reflects that despite his back issues, Knowles was able to walk, hike and occasionally run.  (A.R. 487, 499, 501, 659, 725, 739, 747, 751, 767.)

As to Knowles' mental limitations, the ALJ likewise found the medical records were not wholly consistent with Knowles' subjective complaints about his ability to work.  (A.R. 45-47.)  The ALJ recognized that Knowles' had significant impairments, but found Knowles' memory, concentration, behavior and ability to communicate were intact such that he would be able to maintain simple, low-stress work with limited changes and limited interaction demands.  (A.R. 46.)  The ALJ also noted that Knowles' anxiety and depression were relatively well managed with counseling and medication, and that worsening symptoms appeared to be connected to medication non-compliance.  (A.R. 46-47.)  Again, the ALJ's findings are supported by the record.  For example, while Dr. Velin's neuropsychological evaluation showed Knowles has difficulty with social integration and adaption due to autism spectrum disorder, it also demonstrated he has excellent levels of general information and knowledge and a full-scale IQ of 113.  (A.R. 641-44.)  Although Knowles struggled with social interaction, he

reported doing "ok" interacting one-on-one. (A.R. 1265, 771.) Treatment notes from various providers indicated Knowles was attentive, communicative, exhibited normal behavior, memory and concentration, and improved with therapy. (A.R. 53, 641-644, 651, 663, 689, 772, 775-776, 780-781, 787, 792, 804, 821, 829, 835, 874, 886, 942, 944, 950, 952, 959, 962, 1087, 1120, 1150.) Further, the treatment records indicate that Knowles did well when he was on his medication (A.R. 992, 1004, 1019, 1037-1038, 1210), and worse when he was non-compliant. (A.R. 696, 1004, 1014.)

The ALJ also stated that Knowles' activities with physical and mental demands indicated he could perform some light and simple work. (A.R. 44.) The ALJ's observation is supported by the evidence in the record that shows Knowles was able to participate in activities such as camping, working off and on in 2018 and 2019, playing video games, and motorcycle riding. (A.R. 72, 553, 725, 821, 824, 966, 969, 1149-1150, 1154, 1158, 1162, 1166, 1168, 1170, 1172, 1184, 1223, 1230.)

The ALJ further noted there was evidence Knowles lacked motivation to work. (A.R. 44.) In reaching this conclusion, the ALJ relied on Knowles' own comments to providers that indicated he was uninterested in work because he had not found a job worth applying for, the compensation did not justify the work, and it was easier for him to live with his parents than work an unenjoyable job. (*Id.*)

The ALJ's observation is supported by the record (A.R. 855, 1172, 1178, 1180, 1184, 1210, 1293), and is a legitimate reason for discounting Knowles' testimony. *See e.g. Parton v. Astrue*, 2013 WL 395609, *6 (D. Mont. Jan. 31, 2013) (finding the ALJ did not err in mentioning the claimant's self-reported lack of motivation as a basis for his credibility determination.); *Krenz v. Colvin*, 2014 WL 2889759, *5 (C.D. Cal. June 25, 2014) ("An ALJ may draw reasonable inferences regarding a claimant's motivation to work."); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008) (finding the ALJ properly considered the claimant's motivation to work).

The Court therefore finds the ALJ's assessment of Knowles' subjective symptom testimony is properly supported by specific, clear and convincing reasons.

### C.   Vocational Expert's Hypothetical

Finally, Knowles argues the ALJ failed to incorporate all his limitations into the hypothetical questions posed to the vocational expert.  (Doc. 11 at 30-31.)  The Commissioner counters that the ALJ was not required to include properly discounted evidence in the hypothetical questions.  (Doc. 12 at 20-21.)

Hypothetical questions posed to the vocational expert must set out all the limitations and restrictions of the particular claimant.  *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).  "The testimony of a vocational expert 'is valuable only

to the extent that it is supported by medical evidence.'" *Magallanes*, 881 F.2d at 756 (quoting *Sample*, 694 F.2d 639, 644 (9th Cir. 1982)).  If the assumptions in the hypothetical are not supported by the record, then the vocational expert's opinion that the claimant has a residual working capacity has no evidentiary value. *Embrey*, 849 F.2d at 422.

As discussed above, however, the Court has determined the ALJ adequately supported her reasons for discounting Knowles' testimony.  Knowles asserts the ALJ did not include "the limitations from Dr. Iuliano."  (Doc. 11 at 31.)  But Knowles does not cite to any records from "Dr. Iuliano," and the Court could not locate any record of a Dr. Iuliano in the record.  Accordingly, the hypotheticals the ALJ relied on properly accounted for all of Plaintiff's limitations that the ALJ found credible and that were supported by evidence in the record.

Therefore, the Court finds the ALJ's determination at step five is supported by substantial evidence.

## V.     Conclusion

For the foregoing reasons, the Court orders the Commissioner's decision is **AFFIRMED** and Knowles' motion for summary judgment (Doc. 11) is **DENIED**.

DATED this 30th day of September, 2021.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge

25